**CENTRAL ARIZONA IRRIGATION AND DRAINAGE DISTRICT,** Maricopa–Stanfield Irrigation & Drainage District and New Magma Irrigation and Drainage District, Plaintiffs,

v.

**Manuel LUJAN and Central Arizona Water Conservation District, et al., Defendants.**

**No. CIV 89–1547 PHX PGR.**

United States District Court, D. Arizona.

April 23, 1991.

584

William D. Baker, Robert S. Porter, Teresa H. Foster, Ellis, Baker & Porter, P.C., Phoenix, Ariz., for plaintiffs, Central Arizona Irr. and Drainage Dist., Maricopa–Stanfield Irr. and Drainage Dist. and New Magma Irr. and Drainage Dist.

Linda A. Akers, U.S. Atty., D. Ariz., Michael A. Johns, Asst. U.S. Atty., William H. Swan, U.S. Dept. of Interior, Office of Field Solicitor, Phoenix, Ariz., for defendant, Manuel Lujan, Secretary of the Interior.

Douglas K. Miller, Gen. Counsel, Suzanne K. Ticknor, Staff Atty., Central Arizona Water Conservation Dist., Ralph E. Hunsaker, O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears, Phoenix, Ariz., for defendant, Central Arizona Water Conservation Dist.

Marvin Cohen & Scot Stirling Sacks, Tierney, Kasen & Kerrick, P.A., Phoenix, Ariz., for City of Tucson.

Roderick McDougall, City Atty., Jesse Sears, Asst. Chief Counsel, Phoenix, Ariz., for City of Phoenix.

Barbara Goldberg, Asst. City Atty., Scottsdale, Ariz., for City of Scottsdale.

Julie Lemmon, Larry J. Richmond, Ltd., Phoenix, Ariz., for Maricopa County (Recreation & Parks).

Carol Lewin, Asst. Atty. Gen., Phoenix, Ariz., for State of Arizona (Game & Fish Com'n).

Shiela Schmidt, APS Law Dept., Robert Hoffman, Snell & Wilmer, Phoenix, Ariz., for Arizona Public Service Co.

Donald Daughton, Kathleen Ferris, Bryan, Cave, McPheeters & McRoberts, Phoenix, Ariz., for Arizona Mun. Water Users Ass'n.

M. Bryon Lewis, John Weldon Jr., Joseph Drazek, Jennings, Strouss & Salmon, Phoenix, Ariz., for Salt River Project Agr. Improvement & Power Dist. and Salt River Valley Water Users' Ass'n.

## MEMORANDUM AND ORDER

ROSENBLATT, District Judge.

Pending before the Court are Motions for Summary Judgment addressing all five Counts of Plaintiffs' Complaint. Having considered the entire record and the oral arguments of counsel, the Court concludes that Defendants are entitled to Summary Judgment as to Counts I, II, III, IV, and V.

*Background*

On December 15, 1972, the United States entered into a combined water service and repayment contract with Central Arizona Water Conservation District (CAWCD) entitled "Contract Between the United States and the Central Arizona Water Conserva-

tion District for Delivery of Water and Repayment of Costs of the Central Arizona Project [CAP]" (Master Repayment Contract). CAWCD agreed to repay the costs of CAP that were properly allocable to CAWCD, not to exceed $1.2 billion. The Master Repayment Contract provided for a future amendment of the contract if it was determined that the $1.2 billion repayment ceiling was not adequate to complete the project.

On March 24, 1983, Secretary of the Interior James Watt's decision regarding the allocation of CAP water was published in the *Federal Register*. On November 21, 1983, each of the irrigation districts entered into Agricultural Water Subcontracts with the United States and the CAWCD. The Plaintiffs in this lawsuit are collectively scheduled to receive 43% of the CAP non-Indian agricultural water supply. Currently the Plaintiffs are receiving water under interim contracts until the Project is completed.

The Secretary of the Interior proposed an amendment to the Master Repayment Contract to provide for an increase in the repayment ceiling of the Project. Another aspect of the amendment process was that the Secretary added a provision which allowed municipal and industrial (M & I) users to recharge a portion of their entitlements, consistent with Arizona law. Article 8.8(b)(vi) of the Amended Master Contract states:

Likewise, subcontracts for furnishing water for M & I purposes, including, but not limited to, ground recharge to the extent ground water recharge is consistent with Arizona law, shall provide that, if water delivered thereunder is not presently required for such purposes, such water may be made available by the Secretary to other users.

A recharge provision was already present in the M & I users' subcontracts, and the addition in the Amended Master Contract was an effort to make the Master Contract consistent with the users' subcontracts. Article 4.12(a) of the M & I subcontracts states:

Commencing with the Year following that in which the Secretary issues the Notice of Completion of the Water Supply System, the Subcontractor is entitled to take a maximum of [subcontractor's allocation] acre-feet of Project Water for *M & I uses including but not limited to ground water recharge* (emphasis added).

Article 4.3(b), found in both the M & I and the agricultural users' subcontracts, conflicts with the M & I provision previously cited. It states:

The system or systems through which water for Agricultural, M & I, and *Miscellaneous (including ground water recharge) purposes* is conveyed after delivery to the Subcontractor shall consist of pipelines, canals, distribution systems, or other conduits provided and maintained with linings adequate in the Contracting Officer's judgment to prevent excessive conveyance losses (emphasis added).

In context, this provision relates to the distribution systems and adequate linings for those systems, not to defining the purposes of the CAP. The Secretary in the Amended Master Contract attempted to clarify the intent of these provisions by including recharge as a valid M & I use.

The Amended Master Contract was executed on December 1, 1988 between the Assistant Secretary of the Interior and the CAWCD. By its terms, the Amended Master Contract will not become effective until validated in Arizona Superior Court.

In this case, Plaintiffs have challenged the addition of the recharge provisions in the Amended Master Contract; the challenge has been both substantive and procedural. Plaintiffs have challenged the authority of the Secretary to include the recharge provision in the Amended Master Contract, and they have challenged the process by which the recharge provision was added. Furthermore, they have challenged the Secretary's allocation decision which gives electric, mining and recreation uses a priority over agricultural uses.

COUNT I

In Count I of the Complaint, Plaintiffs alleged that ground water recharge is im-

properly included as an M & I use in the Amended Master Contract. The Court has concluded that Plaintiffs lack standing to assert this claim because they have suffered no legally cognizable injury.

### Standing Requirements

■ The United States Supreme Court requires that a litigant must have standing to assert a claim because federal courts can only hear "cases" and "controversies." *Valley Forge College v. Americans United for the Separation of Church and State*, 454 U.S. 464, 471, 102 S.Ct. 752, 757, 70 L.Ed.2d 700 (1982). In *Valley Forge*, the Supreme Court enunciated a test for standing: "[A]t an irreducible minimum, Art. III requires the party who invokes the court's authority to 'show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant,' and that the injury 'fairly can be traced to the challenged action' and 'is likely to be redressed by a favorable decision.'" *Id.* at 472, 102 S.Ct. at 758 (cites omitted). Therefore, the Constitutional requirements for standing are:

1) party must show actual or threatened injury,

2) injury must be traceable to the challenged action, and

3) injury must be likely to be redressed by a favorable decision.

■ Furthermore, the Court, in *Valley Forge*, addressed three prudential limitations on standing. *Id.* at 474–475, 102 S.Ct. at 759–760. First, the plaintiff must assert his own legal rights. *Id.* Second, the Court refrains from adjudicating "abstract questions of wide public significance" which are only "generalized grievances" and would be better suited for the representative branches of government. *Id.* Third, plaintiff's complaint must fall within the "zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Id.* citing *Association of Data Processing Service Orgs. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970).

### Plaintiffs' Alleged Injuries

■ In their Complaint, Plaintiffs have alleged that as a result of the addition of the recharge provision into the Amended Master Contract, they have suffered "substantial and irreparable harm." The harm that they alleged is as follows: (1) impaired ability to make repayments to the United States under their 9(d) Contracts because the water which is available for the irrigation districts to sell has been reduced as a result of recharge, (2) recharge as an M & I use is given a priority ahead of agricultural use, and (3) deprivation of ability to adequately plan for the use of their water because of the uncertainty as to how much water will be available for their use if recharge is allowed.

An examination of each of the harms cited by Plaintiffs indicates that their alleged injury does not rise to the level of the actual and concrete injury required for standing purposes.

The first harm cited by Plaintiffs, the impaired ability to repay obligations, does not result from the addition of the recharge provision into the Amended Master Contract. Plaintiffs entered "9(d) Contracts" on November 21, 1983, whereby they received a loan to construct their water distribution systems. Plaintiffs also incurred general obligation bonds to help pay their costs. Plaintiffs' combined repayment obligation is anticipated to total $281,867,-578.00. These loans were given based on Feasibility Reports which were compiled using a 1981 Water Supply Study. Plaintiffs are now claiming that, with the recharge provision, they are not getting the same amount of water as was anticipated in the Feasibility Report.

Defendants submitted the affidavit of Larry Dozier, the Assistant General Manager of the CAWCD, in which Mr. Dozier stated: "In 1981, the annual average water supply estimated to be available to CAP from the Colorado River (over the 50–year period from 1988–2037) was 1,152,100 acre-feet per year. In 1986, this estimate was increased to 1,631,300 acre-feet per year, a difference of 479,100 acre-feet per year, representing an increase of almost 42 per-

cent." (Dozier Affidavit, p. 8). Dozier stated that Plaintiffs' Feasibility Reports were based on the 1981 Water Supply Study. Plaintiffs, who receive the residual pool of CAP water, will be receiving more water than the Feasibility Reports estimated.

Defendants also submitted the affidavit of Stevan Augustin, the Chief of the Contracts and Repayment Branch, Water and Lands Division, Arizona Projects Office, United States Bureau of Reclamation (USBR). Mr. Augustin stated:

> Under the terms of its 9(d) Contract, NMIDD [New Magma Irrigation & Drainage District] began making partial repayment of its distribution system loan on February 1, 1989. Since that date NMIDD has paid less than ten percent of the amounts due to the United States under its 9(d) Contract. NMIDD states that it is unable to make the required payments for the reasons, among others, that its *landowners have failed to pay NMIDD's tax assessments and that the payment capacity of the irrigated lands within NMIDD has been reduced because of lower agricultural prices and higher production costs* (letter plus attachment dated July 11, 1989, from NMIDD to USBR).

(Augustin Affidavit, p. 3). Both the Central Arizona Irrigation & Drainage District and the Maricopa–Stanfield Irrigation & Drainage District are obligated to make distribution system loan payments under their 9(d) Contracts beginning February 1, 1991. (Augustin Affidavit, p. 3). Consequently, Plaintiffs' present inability or alleged future inability to make their loan payments is not a result of the addition of the recharge provisions, but rather, a result of factors other than recharge.

Plaintiffs have come forward with no evidence showing that the addition of the recharge provision has resulted, or will result, in their inability to make their payments under their 9(d) Contracts. Rule 56 of the Federal Rules of Civil Procedure states:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth *specific facts* showing that there is a genuine issue for trial.

Plaintiffs have not come forward with the specific facts that would be necessary to show that there is a genuine issue for trial.

The second harm that Plaintiffs allege is that the addition of recharge as an M & I use gives it a priority ahead of agriculture. Plaintiffs maintain that in times of shortage recharge, as an M & I use, would have a higher priority than does agricultural use. The Secretary's allocation decision indicates: "During years of water supply shortages Indian users and non-Indian M & I users would share a first priority on project water supplies. Depending on severity of shortages, project water delivery for miscellaneous uses would be reduced pro rata until exhausted; next, non-Indian agricultural uses would be reduced the same way until exhausted."

Dozier's Affidavit, submitted by Defendants, has indicated that the first shortage year is not projected to occur before the year 2016. (Dozier Affidavit, p. 6). Plaintiffs have shown no evidence to the contrary. Predicting the first shortage year when Plaintiffs' "threatened" injury would become "actual" injury is just too speculative to confer standing on a federal court. Although the *Valley Forge* decision speaks of "threatened injury," this injury still must not be hypothetical or speculative. *See Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 44, 96 S.Ct. 1917, 1927, 48 L.Ed.2d 450 (1976) ("unadorned speculation will not suffice to invoke the federal judicial power"); *O'Shea v. Littleton*, 414 U.S. 488, 494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974) ("Abstract injury is not enough"). Exactly when the first shortage year will occur is nothing more than a projection. Furthermore, it is conceivable that the M & I users would be utilizing their full allotments, without recharge, at the time of the first shortage; in which case, Plaintiffs have no injury. Plaintiffs'

second alleged injury does not seem to be concrete enough to confer standing on the Plaintiffs—whether the injury will ever be realized or not is too hypothetical.

Finally, the third harm that Plaintiffs allege is that they are not able to adequately plan for their water because of the uncertainty as to how much they will get. This allegation also must fail. To truly understand the nature of CAP rights, one must realize that the irrigation districts are allocated the *residual pool* of CAP water—that is, they do not get a fixed amount of water from year to year. Whatever water flows through the CAP system in any given year is allocated in a fixed amount to the Indian and the M & I users, and the remainder goes to the agricultural users. This highlights an obvious problem with denying recharge as an M & I use. Because the agricultural users have a contractual right to the residual pool of CAP water, if recharge is not allowed as an M & I use, it conceivably may never happen. Only if the agricultural users decide not to use all of the residual pool would there ever be a surplus to recharge.

The uncertainty that Plaintiffs fear stems from the uncertainty regarding how much CAP water will be available in a given year, and consequently how much the agricultural users will get. The uncertainty does not stem from the addition of the recharge provision.

The injuries which Plaintiffs have alleged are not concrete; therefore, Plaintiffs do not have standing to assert their claims. "Those who do not possess Art. III standing may not litigate as suitors in the courts of the United States." *Valley Forge*, 454 U.S. at 475–476, 102 S.Ct. at 760–761.

*Plaintiffs' Alleged Right to M & I Water Not Put to a Direct Use*

■ Even if the Court were to find that the Plaintiffs had suffered an actual injury sufficient to confer standing, Summary Judgment would still be properly granted. The heart of Plaintiffs' claim is that they feel that they are *entitled* to any water which the M & I users cannot put to direct use (direct use not including recharge). The basis for this claim is two-fold.

First of all, Plaintiffs claim that as a prerequisite to obtaining loans for construction cost, each District submitted to the Secretary a report entitled "Feasibility of Construction of An Irrigation Distribution System" (Feasibility Report). These Feasibility Reports were approved by the Secretary and served as a basis for the "9(d) Contracts" and subsequent bond issues of each District. Plaintiffs claim that these Feasibility Reports were based on the belief that the Irrigation Districts would receive, in their allocation of non-Indian agriculture water, the water not directly used by the M & I entities and by Indian agriculture. An examination of the actual Feasibility Reports indicates that the provision on which Plaintiffs are relying states:

> Other factors which could lead to an increase in the amounts of water available to the District, particularly in the early years of the period of analysis, include the following:
>
> (1) The full amount of water allocated to the Indian reservations, to municipal and industrial users, and to other non-Indian irrigation users may not be totally used by those entities during the early years.
>
> \* \* \* \* \* \*

This provision does not confer a vested right for the agricultural users to get any M & I water not used in a particular year; rather, it is stated in contingent terms. Furthermore, if M & I users are recharging their water allocations, they are *using* their water and there is simply none left over for agricultural users to take.

Next, the agricultural users base their claim of entitlement to M & I water, not directly used, on the "Background for Decision" found in Secretary Watt's Allocation Order, decided on February 10, 1983. The pertinent provision states:

> Non–Indian agricultural water users are expected to contract for and receive water available from the CAP facilities which is not being utilized in the early years by the M & I and Indian contractors. The amount of this water will be relatively substantial in the early years of the project and during years of high

runoff in the Colorado River Basin. Amounts are expected to decrease during the project life as the M & I use increases.

Once again the problems remain the same—that is, this provision does not rise to the level of a vested right to the water; and, if M & I users are recharging, they seem to be "utilizing" their water within the meaning of the statute.

Both M & I users and agricultural users pay an operation, maintenance, and replacement (OM & R) charge for CAP water per acre-foot. Additionally, however, agricultural subcontractors will pay, under their long-term water service contracts, a capital charge of $2 per acre-foot for water *actually delivered* at their turnouts on the CAP aqueduct. The M & I subcontractors will pay, under their long-term water service contracts, a capital charge of $5 per acre-foot for their *entire allocation, regardless of the quantity of water taken.* The M & I capital charge escalates over time at a rate of about $1 per acre-foot per year until it reaches $40 per acre-foot. Because the M & I users are already paying for their full entitlement of water, it seems inappropriate to deny them the use of that complete entitlement.

The Ninth Circuit has stated that project water "is not there for the taking (by the landowner subject to state law), but for the giving by the United States. The terms upon which it can be put to use, and the manner in which rights to continued use can be acquired, are for the United States to fix." *Israel v. Morton*, 549 F.2d 128, 133 (9th Cir.1977). Clearly, the Plaintiffs can point to no contractual provision which entitles them to M & I water which is not put to a direct use. It seems that Plaintiffs merely have had an *expectation* that they would get this water. However, mere expectations do not rise to the level of vested rights.

*Secretary's Broad Discretion to Manage CAP*

■ The Secretary of the Interior is given broad discretion in the management of the CAP. "[T]he Secretary shall construct, operate, and maintain the Central Arizona Project, . . ." 43 U.S.C. § 1521. This provision has been construed broadly. The Secretary of the Interior is authorized to perform any and all acts and to make rules and regulations which are necessary and proper to carry the provisions of the Act into full force and effect. 43 U.S.C. § 373. Furthermore, subcontracts with irrigation and M & I users "shall be subject to the Secretary's approval." 43 U.S.C. § 1524(b)(1).

The Reclamation Reform Act generally provides: "No contract relating to municipal water supply or miscellaneous purposes or to electric power or power privileges shall be made unless in the judgment of the Secretary, it will not impair the efficiency of the project for irrigation purposes." 43 U.S.C. § 485h(c). However, the specific statutory provision governing the CAP states: "Contracts relating to municipal and industrial water supply under the Central Arizona Project may be made without regard to the limitations of the last sentence of section 485h(c) of this title," which is the non-impairment of irrigation provision quoted above. Consequently, although the Secretary generally must take care in the execution of M & I contracts not to impair irrigation purposes, under the CAP, that limitation does not apply. This distinction seems to be very important because Congress made a conscious choice to treat the CAP differently, at least as it regards irrigation.

Even though the Secretary possesses broad powers in the management of the CAP, his actions may still be reviewed under the Administrative Procedure Act (APA). 5 U.S.C. § 706. Under this provision,

The reviewing court shall— . . .

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

. . . . .

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

. . . . .

*Id.*

The first inquiry is to determine whether the Secretary's decision to include the recharge provision in the Amended Master Contract was an abuse of discretion or an arbitrary decision. The Administrative Record shows that the Amended Master Contract was arrived at after much negotiation and discussion.

The Commissioner of the Bureau of Reclamation, in a memo dated November 30, 1988 to the Assistant Secretary Ziglar, offered the following reasons for his recommendation that the recharge provision be added to the Amended Master Contract:

1) the master repayment contract should be conformed to the approved standard form M & I water service subcontract and the existing M & I subcontracts;

2) while the 1983 allocation decision and supporting environmental documentation reflect the expectation that more CAP water would be used for irrigation than for other purposes in the early year of the project, they contain nothing that can reasonably be said to rise to the level of formal preference in favor of irrigation use or to preclude M & I contractors from fully utilizing their entitlements to the extent permitted by law (in fact, insofar as the environmental documentation addresses the issue at all, it indicates that recharge was a matter to be left to State and local discretion);

3) M & I contractors pay for their allocated entitlements on a capacity basis, and it is therefore reasonable to allow them to fully utilize those entitlements for purposes permitted by State law; and

4) inclusion of the provision will not conflict with the CAP authorizing legislation or any other congressional directives concerning the project and will expressly make the amendatory repayment contract consistent with State law.

The Administrative Record is replete with correspondence between all of the af-

fected parties and the Bureau of Reclamation and the Department of the Interior. On numerous occasions, the irrigation districts voiced their concerns and their arguments on the impropriety of a decision to add the recharge provision. The affected parties met and discussed the addition of the recharge provisions; and, after weighing all of the arguments, the decision was made to add the recharge provision. This decision was not made capriciously, but after much deliberation and consultation.

The next step is to determine whether the Secretary acted beyond his statutory discretion. As previously stated, under the statutory provisions regarding the CAP, the Secretary is vested with considerable discretion to operate and maintain the CAP. The only argument produced by Plaintiffs that the Secretary exceeded his statutory discretion is that to allow recharge by M & I users, agricultural users may be forced to return to pumping groundwater to satisfy their full needs. The problem is that Congress, in authorizing the CAP, could not have intended to eliminate the need for groundwater pumping but rather tried to reduce the reliance on groundwater. The M & I users, by recharging a portion of their allocation, are in effect reducing their future reliance on groundwater. It is within the Secretary's discretion to allow the M & I users to utilize their full entitlements by recharging a portion of their allocation for future use, even at the risk that the agricultural users may have to turn their pumps back on.

Given all of the considerations, the Secretary acted within the scope of his power and his broad discretion when he added the recharge provision to the Amended Master Contract.

*Role of the Arizona Legislature*

■ In 1980, the Arizona legislature enacted a comprehensive Groundwater Code. A.R.S. § 45–401 et seq. In 1986, the legislature added to this Code provisions regarding Artificial Groundwater Recharge. A.R.S. § 45–651–655.

In order to recharge groundwater, an entity must apply to the Director of Water

Resources for the State of Arizona for a recharge project permit. A.R.S. § 45–652 A. Such an applicant has a right to use the proposed source of water for recharge purposes. A.R.S. § 45–652 B(2). Many of the municipalities have already made such applications for recharge. In a letter from the Arizona Municipal Water Users Association to Assistant Secretary Ziglar, the cities maintain that they have spent $15,000,000 to evaluate groundwater recharge and to develop recharge and storage projects. They argue that they did so because they relied on the language of § 4.12(a) of their M & I subcontract which allows recharge as an M & I use.

One provision of the Arizona statutes, A.R.S. § 45–157, has been brought to the Court's attention as seemingly conflicting with the Secretary's decision. That provision states:

A. As between two or more pending conflicting applications for the use of water from a given water supply, when the capacity of the supply is not sufficient for all applications, preference shall be given by the director according to the relative values to the public of the proposed use.

B. The relative values to the public for the purposes of this section shall be:

1. Domestic and municipal uses. Domestic uses shall include gardens not exceeding one-half acre to each family.

2. Irrigation and stock watering.

3. Power and mining uses.

4. Recreation and wildlife, including fish.

5. *Artificial groundwater recharge* pursuant to chapter 2, article 13 of this title.

This statute seems to indicate that recharge cannot be undertaken until all other uses of the water are exhausted. The problem with this statute is that, as it pertains to the operation of the CAP, if interpreted literally it would usurp the power of the Secretary of the Interior to allocate water among users. The CAP is a federally subsidized project, and the federal government is authorized to allocate the resources which flow through the CAP. *See Israel v. Morton* at 132–33.

The Ninth Circuit has stated:

A distinction must be recognized between the nature of nonproject water, such as natural-flow water, and project water, and between the manner in which rights to use of such waters are obtained. Right to use of natural-flow water is obtained in accordance with state law.... Project water, on the other hand, would not exist but for the fact that it has been developed by the United States.... The terms upon which it can be put to use, and the manner in which rights to continued use can be acquired, are for the United States to fix.

*Israel v. Morton* at 132–133.

The allocation and preferences given to CAP water seems to be within the exclusive province of the Secretary of the Interior; once the preferences are already established, the possible *uses* of that water are governed by state law. Consequently, the Secretary of the Interior is authorized to allocate CAP water to M & I users. Then M & I users may use their water for any use authorized by Arizona law, including recharge.

*Conclusion*

The Plaintiffs are obviously not satisfied with the Secretary's decision to allow recharge as an M & I use to the extent it is consistent with Arizona law. This displeasure does not rise to the level of standing however. The Plaintiffs can point to no concrete injury which occurs from the addition of this recharge provision; the only injuries which they can allege are hypothetical and contingent on numerous factors before they will ever occur.

Furthermore, Plaintiffs have no rights to the water in question. The water, which Plaintiffs desire, has been contracted for by the M & I users. Plaintiffs' expectations that they would receive certain water does not rise to the level of a vested right.

The actions which the plaintiffs are complaining of seem to fall within the sole discretion of the Secretary of the Interior. As previously stated, the Secretary did not

abuse his discretion, nor did he exceed the scope of his authority.

The Arizona legislature permitted artificial groundwater recharge as a legitimate use of water within the state of Arizona. The M & I users are simply exercising a valid use of their water if they recharge it. Plaintiffs' remedy may indeed be political.

## COUNT II

Plaintiffs, in Count II, challenged Secretary Watt's allocation order which designated power, mining, and recreation as M & I uses with a priority ahead of agriculture. The Court has determined that Count II of Plaintiffs' Complaint is barred by both the statute of limitations and res judicata.

### Statute of Limitations

■ Secretary Watt signed the allocation order on February 10, 1983, but the order was not published in the *Federal Register* until March 24, 1983. Plaintiffs filed their Complaint on March 23, 1989. The statute of limitation for all civil actions against the United States is "six years after the right of action first accrues." 28 U.S.C. § 2401(a). An action brought under the Administrative Procedure Act (APA) is also governed by the six year statute of limitations. *Sierra Club v. Penfold*, 857 F.2d 1307, 1315 (9th Cir.1988). One of the issues in Count II is when the cause of action first accrued.

Defendants filed an affidavit from Wesley E. Steiner, the Director of the Arizona Department of Water Resources (DWR) from 1980–1985. He stated that he transmitted a letter dated March 1, 1983 along with a copy of Secretary Watt's Allocation Decision to all CAP applicants, including Plaintiffs. He testified that in accordance with DWR office procedure, the March 1, 1983 letter and a copy of the Decision were mailed to all CAP applicants, including Central Arizona Irrigation District, Maricopa–Stanfield Irrigation District, and New Magma Irrigation District, on March 1, 1983 or within no more than three days thereafter.

The accompanying Allocation Decision included this Summary: "The purpose of this action is to provide notice of final decisions made by the Secretary of the Interior concerning the allocation of water developed by the Central Arizona Project (CAP) to Indian and non-Indian water users, the conditions upon which those allocations were made, and water service contracting."

The mailing of a letter creates a presumption that the letter was delivered. *Hagner v. United States*, 285 U.S. 427, 430, 52 S.Ct. 417, 419, 76 L.Ed. 861 (1932) ("The rule is well-settled that proof that a letter properly directed was placed in a post office, creates a presumption that it reached its destination in usual time and was actually received by the person to whom it was addressed"). The Ninth Circuit has explained this presumption further. *United States v. Simmons*, 476 F.2d 33, 36–37 (9th Cir.1973). The Ninth Circuit said that an *irrebutable* presumption that mail sent is actually received violates due process; however, a rebuttable presumption is acceptable. *Id.* In this case, the three irrigation districts were all sent copies of the letter which seems to lend credence to the presumption that they had actual notice of the Secretary's Allocation Decision before it was published in the *Federal Register*. Furthermore, Plaintiffs have done nothing to rebut this presumption of receipt.

Generally, under the APA, a rule is enforceable once it is published in the *Federal Register*. In *RCA Global Communications, Inc. v. F.C.C.*, 758 F.2d 722, 730 (D.C.Cir.1985), the Court said: "Although statutory time limitations on judicial review of agency action are jurisdictional, self-evidently the calendar does not run until the agency has decided a question in a manner that reasonably puts aggrieved parties on notice of the rule's content."

Section 552(a)(1) of the APA provides: "Except to the extent that a person has *actual and timely notice* of the terms thereof, a person may not in any manner be required to resort to, or be adversely affected by, a matter required to be published in the Federal Register and not so published." Publication in the *Federal Register* serves as constructive notice; however, publication in the *Federal Reg-*

*ister* is not required as against persons with "actual and timely notice." Persons with actual notice cannot rely on the fact that constructive notice comes later. *See Tearney v. National Transportation Safety Board,* 868 F.2d 1451, 1454 (5th Cir. 1989) ("persons with actual notice of a rule, even though unpublished, are held accountable."), cert. denied —— U.S. ——, 110 S.Ct. 333, 107 L.Ed.2d 322 (1989).

Plaintiffs have subsequently argued that the statute of limitations does not begin to run on the allocation decision until a contract based on the allocation decision has been entered. They argue that the 1983 allocation was merely an offer to enter into water service contracts that did not become final and irrevocable until the United States and the water users executed a water service contract. Plaintiffs rely on a decision in the case of *Babbitt v. Andrus,* Civ. 80–992–PHX–CLH. In that case, Judge Hardy determined as a Conclusion of Law: "An allocation by the Secretary of the Interior of a portion of water from the Colorado River to a user in central Arizona is not final and irrevocable until the United States of America and the user have executed a water service contract."

Plaintiffs allege that because the first contract was signed on March 20, 1985, that is the date on which the allocation decision became final and irrevocable; and, consequently, that is when the cause of action accrued.

The *Babbitt v. Andrus* decision indicates that a user does not have vested rights to receive water until a contract is executed. It does not stand for the proposition that a cause of action does not accrue until a contract is entered. Plaintiffs, who were designated allottees of CAP water and who were already in the process of feasibility studies for CAP water, could have challenged the Secretary's Allocation Decision after it was promulgated, even though there were no formal contracts yet.

Because Plaintiffs had actual notice of the Secretary's allocation decision before March 23, 1983, their action filed on March 23, 1989 is precluded by the statute of limitations.

*Res Judicata*

■ Defendants allege that even if the Court concludes that the statute of limitations is not a bar to Count II of Plaintiffs' Complaint, Plaintiffs should still be precluded from raising Count II because of res judicata. Defendants base this defense on the stipulations entered into in the 1977 validation proceeding for the Master Repayment Contract in the Maricopa County Superior Court. Although the 1983 Allocation Decision was not addressed in the 1977 validation proceeding (which was not finalized until May 25, 1983), the priority issues in the validation proceeding and the present suit remain the same. Essentially, Plaintiffs in the present suit are alleging that the Secretary has no authority to place industrial users (power, mining, and recreation) ahead of agricultural users. This is the same issue that they argued in the 1977 validation proceeding and lost, albeit by stipulation.

Federal law requires that any contracts with the United States for the delivery of water from a reclamation project will not be valid and binding on the federal government until after those contracts have been validated under the appropriate state proceedings. 43 U.S.C. § 511 and 43 U.S.C. § 423e. In Arizona, those validation proceedings are prescribed in A.R.S. §§ 45–2631–2634.

The CAWCD commenced a validation action in the Maricopa County Superior Court on April 20, 1977. The same irrigation districts that serve as Plaintiffs in the present case challenged the 1977 validation proceeding in the Superior Court. The basis of their challenge was that the contract entered into between the CAWCD and the United States was *invalid* because it was contrary to both federal and Arizona law. The reason it was contrary, according to the irrigation districts, was that it placed industrial users, i.e. power and mining users, in a position of priority over agricultural users.

The irrigation districts became the Respondents in the validation proceeding. In their Answer, ¶ II, they asserted: "Each of the Districts has filed with the Secretary of

the Interior a notice of intent to contract for Central Arizona Project water. Such contracting would be done by subcontract with Petitioner and their provisions of the contract presently before the Court would control such subcontracts and affect substantial rights of Respondents."

The irrigation districts went on to address these "substantial rights" that they were concerned about. In ¶ VII, they stated:

> Respondents further allege that the contract entered into does not conform to and indeed violates federal and state law governing such contracts. Article 8.11 thereof provides for a priority in times of shortage of water supplied to so-called "industrial" users over agricultural users. Petitioner was not authorized to enter into a contract containing such provision which violates federal and state law. The contract is for that reason not valid, binding upon nor enforceable against the Petitioner, and cannot be validated in this proceeding in its present form. For these reasons, the actions of the Board of Directors of Petitioner in entering into and ratifying said contract are null and void.

The provision of the contract that the irrigation districts were concerned about was Article 8.11 which provided for "Priorities in Case of Shortage."

CAWCD filed a Motion for Summary in the validation proceeding. In their Response, the irrigation districts maintained that the validation suit was intended to test issues which might arise in the contract in advance of such disputes. They then proceeded to argue that the priorities which were designated by the Secretary was invalid because they were contrary to federal and state law. They maintained that the invalidity of the "Priority in Case of Shortage" provision, along with other provisions which are not the subject of the present case, precluded the contract from being validated. "In addressing the validity question, other questions must be addressed which are 'necessarily incident' to the basic question of validity.... One of the issue necessarily incident to the ques-

tion of validity is the control to be exercised over project waters." (Response to Motion for Summary Judgment in the validation proceeding, p. 9). The irrigation districts spent the first *twenty-eight* pages of their Response to the Petitioner's Motion for Summary Judgment addressing why the priority determination was invalid. Consequently, they had a "full and fair" opportunity to litigate the issue in the first proceeding, and the issue was actually litigated. *J.W. Hancock Enterprises, Inc. v. Arizona State Registrar of Contractors*, 142 Ariz. 400, 410, 690 P.2d 119, 129 (App. 1984).

The validation proceeding was ultimately concluded by stipulation. The parties, CAWCD and the irrigation districts, stipulated to the Findings of Fact and Conclusions of Law dated May 24, 1983. Conclusion of Law # 8 states: "That the contract between the United States and the Central Arizona Water Conservation District for delivery of water and repayment of cost to the Central Arizona Project (Contract NO. 14–06–W–245) is valid and binding upon and enforceable against the Petitioner, Central Arizona Water Conservation District." The subsequent judgment, which incorporated Conclusion of Law # 8, was entered May 25, 1983.

The irrigation districts' initial argument was that determination of the validity of the contract could only be done after the resolution of the priority issue. The parties' Stipulation that the contract is valid and enforceable seems to resolve the issue of the priority dispute, at least as between the parties. "[A] final determination in the state court ... is conclusive in the subsequent federal litigation if the later suit is between the same parties, on the same issue, and if the issue sought to be precluded was actually litigated and necessary to the prior determination." *Kendall v. Overseas Development Corp.*, 700 F.2d 536, 538 (9th Cir.1983).

In the present case, all of these requirements have been met. First of all, the same parties are involved in the two suits. Secondly, the issue involved is the same issue, namely, whether industrial users can

be given a priority ahead of agricultural users. Thirdly, the issue was actually litigated in the first proceeding, as was evidenced by the lengthy argument in the Response to the Motion for Summary Judgment. Finally, the issue was necessary to the determination of the first action. The irrigation districts had argued that the contract could not be validated because of this priority provision. Subsequently, they agreed that the contract was indeed valid and enforceable. Now they should be estopped from coming into court and realleging the same issue that they conceded in the 1983 Stipulation.

"Matters which were actually litigated and determined in the first proceeding cannot later be relitigated ... Once a party has fought out a matter in litigation with the other party, he cannot later renew that dual." *Commissioner of Internal Revenue v. Sunnen,* 333 U.S. 591, 598, 68 S.Ct. 715, 719, 92 L.Ed. 898 (1948).

## COUNT III

### Reclamation Reform Act

■ Plaintiffs charge the Secretary of the Interior with violating the notice provisions of the Reclamation Reform Act. Specifically, 43 U.S.C. § 485h(f) states:

No less than sixty days before entering into or amending any repayment contract or any contract for the delivery of irrigation water (except any contract for the delivery of surplus or interim irrigation water whose duration is for one year or less) the Secretary shall—

(1) publish notice of the proposed contract or amendment in newspapers of general circulation in the affected area and shall make reasonable efforts to otherwise notify interested parties which may be affected by such contract or amendment, together with information indicating to whom comment or inquiries concerning the proposed actions can be addressed; and

(2) provide an opportunity for submission of written data, views and arguments, and shall consider all substantive comments so received.

The Secretary of the Interior published a legal notice in numerous Arizona newspapers. The notice contained no mention of the recharge provision. Plaintiffs contend that the Secretary had the obligation to notice all of the proposed amendments, not just the increase in the repayment ceiling.

The problem with Plaintiffs' claim is that they had *actual* notice of the proposed amendment regarding the recharge provision. Hence, Plaintiffs have suffered no injury because of the failure to include recharge language in the notice. Plaintiffs are not the proper parties to bring a claim regarding the failure to include the recharge provision. Plaintiffs had complete, actual knowledge about the recharge provisions. In fact, they discussed these provisions with the Department of the Interior on numerous occasions.

Plaintiffs lack standing to assert the claim within Count III of their Complaint. Plaintiffs' claim under Count III is the type of "generalized grievance about the conduct of government" that *Valley Forge* counseled against. 454 U.S. at 483, 102 S.Ct. at 764. "[A]ssertion of a right to a particular kind of Government conduct, which the Government has violated by acting differently, cannot alone satisfy the requirement of Art. III without draining those requirements of meaning." *Allen v. Wright,* 468 U.S. 737, 754, 104 S.Ct. 3315, 3326, 82 L.Ed.2d 556 (1984), reh'g denied 468 U.S. 1250, 105 S.Ct. 51, 52, 82 L.Ed.2d 942 (1984).

## COUNT IV

In Count IV of their Complaint, Plaintiffs argue that the inclusion of the recharge provision in the Amended Master Contract violates the National Environmental Policy Act of 1969 (NEPA). The Court concludes that recharge is not a major federal action; therefore, compliance with NEPA is not required in order to add the recharge provision.

### Recharge Not a Federal Action

■ The National Environmental Policy Act of 1969, 42 U.S.C. § 4332(2)(C), requires all federal agencies, including the Department of Interior, to:

Include in every recommendation or report on ... *major federal action* signifi-

cantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action;

(ii) any adverse environmental effect which cannot be avoided should the proposal be implemented;

(iii) alternatives to the proposed action;

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity; and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented (emphasis added).

The Environmental Impact Statement (EIS) for the CAP was originally filed on March 19, 1982, and it covered all then-existing elements of the CAP. The Secretary, in this EIS, did not review the effects of ground water recharge because:

Under the Colorado River Basin Project Act (Public Law 90–537), ground water recharge is not an authorized Central Arizona Project purpose. In fact, Congress specifically directed the Secretary of the Interior to prevent excessive conveyance losses in delivery of water to the contractors. Certainly nothing would preclude a contractor from using CAP water for recharging the ground water, however, no applicants have indicated such intent. Therefore, no alternative involving allocation and water service contracting of CAP water for ground water recharge was analyzed.

Plaintiffs contended that the Secretary violated NEPA because he did not prepare a supplemental EIS or an environmental assessment (EA) when he added the recharge provision to the Amended Master Contract. However, the NEPA statute only requires an EIS or an EA when "major federal action" is undertaken. Thus, the issue is whether the addition of the recharge provision is to be considered "major federal action." The only federal action in the addition of the recharge provision is the federal government allowing its M & I users to recharge their water allocations consistent with Arizona law. The federal

government is not doing the actual recharge. The subcontractors are doing the recharge pursuant to Arizona law. Whether or not any of the users will actually recharge their allocations is now out of the hands of the federal government. In fact, Master Contract Article 8.6 states:

Whether or not the United States operates and maintains the project facilities, the United States shall not be responsible for the control, carriage, handling, use, disposal, or distribution of water after said water has been diverted from the water supply system.

Recharge is accomplished once the water has been diverted from the water supply system. The federal government has nothing to do with the recharge activities of its subcontractors.

To determine whether recharge is a "major federal action," one must look to see if it is "so functionally interdependent [with the operation of the CAP] that the projects constitute a single federal action." *Enos v. Marsh*, 769 F.2d 1363 (9th Cir.1985).

The most compelling case on this issue is an Arizona District Court case, *Animal Defense Council v. Donald P. Hodel*, Civ. No. 86–666–PHX–RGS, decided by Judge Strand. In that case Animal Defense Council filed a NEPA action to challenge the adequacy of the final EIS on the Tucson Aqueduct in the CAP. In their Complaint, one of the claims for relief was "the EIS should have included a cost benefit analysis of the recharge system." In denying this claim for relief, the Court stated:

The decision regarding whether the utilization of a recharge system is required, and if so how to implement such a decision, is the responsibility of the City of Tucson and is not part of the Central Arizona Project. Since the recharge issue is not part of the federal project, recharge was not required to be discussed in the EIS.

The result reached in *Animal Defense Council* seems correct. Many other cases support this determination, as well. The situation in the present case with the *municipalities* wanting to recharge part of their water allocation is similar to that of *Enos v. Marsh* where the *state* was plan-

ning to construct shoreside facilities at Barbers Point Naval Air Station. 769 F.2d at 1363. In that case, the Ninth Circuit determined, "[T]he state and federal projects serve complementary, but distinct functions; they are not as interrelated as were the parts of the same highway construction [as in *Friends of the Earth, Inc. v. Coleman,* 518 F.2d 323 (9th Cir.1975)]." *Id.* at 1371.

In determining "major federal action," the Court will look at "the nature of the federal funds used and the extent of federal involvement." *Sierra Club v. Penfold,* 857 F.2d 1307, 1314 (9th Cir.1988). In the present case, the United States does not involve itself with the recharge project—it provides no funding for recharge and it provides no federal supervision of the recharge projects. Again, looking to the *Enos* case, the Court said, "Where federal funding is not present, we have generally been unwilling to impose the NEPA requirement of filing an EIS." *Id.* at 1372. In the present case, no federal funds are used to develop the recharge programs or to actually recharge water. It is true that the water that will be recharged is coming from a federally-funded project, the CAP, but the relationship between the CAP itself and the recharge projects is merely a "complementary" but "distinct" function.

Furthermore, the federal government is not involved in supervising the recharge projects. As previously stated, the Master Contract states that the federal government assumes no responsibility for the use of the CAP water once it is diverted from the CAP system. Hence, because there is no federal funding nor supervision of the recharge project, groundwater recharge is not "major federal action." Hence, NEPA does not require an environmental impact statement nor environmental assessment.

Arizona has developed its own requirements for those applying for recharge permits. The law requires recharge applicants to undertake environmental studies on how recharge will affect the surrounding environment. A.R.S. § 45–653 A(9). This provision requires, along with the recharge application:

A copy of a study that demonstrates:

(a) The area of hydrologic impact of the project.

(b) That the project is hydrologically feasible.

(c) That the project will not cause unreasonable harm to land or other water users within the area of hydrologic impact of the project.

Plaintiffs must comply with this Arizona law before they can recharge water. The federal government does not have to perform its own EIS or EA; the responsibility for the environmental analysis falls on those who wish to conduct the actual recharge.

*Conclusion*

The federal government is not providing funds nor supervision over the municipalities' recharge projects; therefore, recharge is not a "major federal action" within the meaning of NEPA. Because the prerequisites for imposing NEPA have not been met, the Secretary of the Interior was not required to supplement the Environmental Impact Statement to cover the addition of the recharge provision to the Amended Master Contract.

COUNT V

*Secretary's Delegation of Authority*

 Plaintiffs have alleged that even though the Secretary has power to delegate his authority to an Assistant Secretary, he failed to comply with proper procedures on this occasion.

Delegation is authorized in 16 U.S.C. § 590z–11. It states:

For the purpose of facilitating and simplifying the administration of the Federal reclamation laws and this subchapter, the Secretary of the Interior is authorized to delegate, from time to time and to the extent and under such regulations as he deems proper, his powers and duties under said laws to the Commissioner of Reclamation, an Assistant Commissioner, or the officer in charge of any office, division, district, or project of the Bureau of Reclamation.

Assistant Secretary for Water and Science James Ziglar executed the amended

contract with the CAWCD. Plaintiffs have challenged that he is not the proper person to execute the contract. In their Complaint, Plaintiffs alleged: "During the pendency of negotiations of the Amended Master Contract the Bureau of Reclamation advised that the Secretary would execute the Amended Master Contract." Furthermore, "Upon information and belief the Secretary has failed to properly delegate authority for executing the Amended Master Contract to the Assistant Secretary."

Plaintiffs have failed to show that the Secretary did not comply with the proper delegation procedures. Furthermore, Plaintiffs have produced no argument as to how they were injured by the delegation to the Assistant Secretary.

Because Plaintiffs have not been able to come forward with any possible argument about how the Secretary failed to properly delegate his power to the Assistant Secretary, or any argument as to injury that resulted from this delegation, Count V should be dismissed.

Therefore,

IT IS ORDERED that the Defendants' Motions for Summary Judgment on Counts I, II, III, IV, and V are Granted and that this action is dismissed with prejudice.